UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISON

| | |
|---|---|
| ROSS PONDER AND SARAH PONDER, INDIVIDUALLY, AND AS NEXT FRIEND OF H.P., L.P., and R.P., MINORS,<br>    Plaintiffs,<br><br>VS.<br><br>AUSTIN MONTESSORI SCHOOL, INC.; RONALD GRAE BAKER, INDIVIDUALLY; and JINNY GONZALEZ, INDIVIDUALLY,<br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§  CIVIL ACTION NO. 1:25-cv-00615 ADA-SH<br>§<br>§<br>§<br>§<br>§<br>§ |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

COME NOW Plaintiffs, Ross Ponder and Sarah Ponder, Individually and as Next Friend of H.P., L.P. and R.P., minors ("Ponders" or "Plaintiff"), file their First Amended Complaint against Defendant Austin Montessori School, Inc.("AMS"), Grae Baker ("Baker"), and Jinny Gonzalez ("Gonzalez") (collectively "Defendants") and show the Court as follows:

**I. PARTIES**

1.      Plaintiffs Ross and Sarah Ponder are the parents of Plaintiff H.P., L.P., and R.P., minors.  Plaintiffs reside in Travis County, Texas.

2.      Defendant Austin Montessori School, Inc. is a Texas corporation with its principal place of business at 5006 Sunset Trail, Austin, Texas 78745.  Defendant AMS has previously answered and accepted service.

3.      Defendant Ronald Grae Baker is an individual that resides at 10521 Redmond Road, Austin, Texas 78739. Defendant Baker has previously answered and accepted service.

4.      Defendant Jinny Gonzalez is an individual that resides at 2907 Pops Way, Austin, Texas 78745.  Defendant Gonzalez has previously answered and accepted service.

## II. JURISDICTION

5.  Subject matter jurisdiction is improper in Federal Court because all the claims are based in Texas law and no Federal claims exist. Jurisdiction is proper in Travis County District Court.

## III. SUMMARY

6.  The Ponders fully embraced Montessori practices and were excited to have enrolled their children at AMS. Unfortunately, after enrolling the children, the Ponders learned that AMS does not follow many of the practices of Dr. Maria Montessori and her traditional method, instead using their own practices, which were very harmful to the Ponder children.

7.  Montessori guides are trained to "follow the child" by emphasizing self-directed learning and movement within a prepared environment. Montessori education principles involve the use of collaboration with the parents to create a support plan to best support each child. Montessori education emphasizes discipline through positive guidance and self-regulation, rather than punishment.

8.  At critical points, Defendants did not collaborate with the Ponders and intentionally prevented information from being shared with parents. Defendants utilized questionable and inappropriate punishments.

9.  Defendants also did not disclose that they adopted their own form of quack medicine used to diagnose and treat their students, in violation of state laws and in opposition of standard medical practices.

10. AMS fraudulently induced the Ponders into contracts. When the Ponders questioned the practices of AMS, the children were expelled.

11. Further, AMS allowed and supported Gonzalez, the Director of Early Childhood Programs, to practice medicine without a license, allowing her to make diagnoses of children, knowing she

had no medical training. Gonzalez "diagnosed" and treated H.P. for "an underdeveloped will." Her prescribed 'treatment plan' included: controlling family medical routines, isolation therapy, dictating parent-child communication, rigid behavioral modification schedules, and specific therapeutic interventions.

12. To prevent exposure of AMS's quack medical and other practices, AMS refused to provide important information to the parents of the children attending AMS and prevented meaningful parent communication with staff, including information regarding incidents and specifics of the medical treatment. AMS failed to allow the Ponders access to medical, school and treatment records in violation of state law.

13. The Ponders were repeatedly called to pick up H.P. and/or R.P. without notice and frequently without detailed information regarding an alleged incident.

14. Upon questioning AMS's quack medicine and lack of communication and bringing these issues to the attention of other family members at AMS and the Texas Health and Human Services, AMS retaliated by expelling the Ponder children.

### IV. FACTS

15. The Ponders first enrolled at AMS in August of 2023. The Ponder children had previously thrived in another Montessori environment. The Ponders believed AMS would provide a nurturing supportive environment for their children in keeping with Dr. Montessori's teachings.

16. The Ponders' enrollment contracts were for an 8 am-3:15 school day (full-time) for all of their children. During the 2023-2024 school year, H.P. and L.P. attended AMS at a cost of $40,555. During the 2024-2025 school year, R.P., H.P., and L.P. attended AMS at a cost of $57,973.50. Attached as Exhibit 1 is a redacted (public version) of a contract for H.P.

17. The Ponders were required to remain under contract when two children's hours were

3

reduced. The reduction in the amount of tuition was minimal (about $3000 a year) and the cost for other care to replace the contracted care was significant, causing financial burden.

18. H.P.'s first day at AMS was August 17, 2023. AMS noted that there were no issues when H.P. napped. On or about August 29, 2023, the Ponders were informed that their son, H.P. was having issues sleeping during nap time. A meeting was immediately held the same day to address the matter.

19. On Thursday, August 31, 2023, AMS informed the Ponders that H.P. would need to be picked up starting at noon each day. The Ponders were told this was a transition period to allow H.P. to get used to AMS. The Ponders were given no alternatives. The Ponders specifically chose AMS because it allowed for full day coverage for all their children.

20. AMS did not offer to let the Ponders out of their contract. The Ponders were strapped into a contract for full-time care but were receiving two to three hours of care.

21. On Friday, September 8, 2023, Gonzalez emailed the Ponders to request a meeting regarding H.P.'s "dysregulation." The Ponders were told that H.P. was not allowed to return to the school until after the meeting occurred on September 11, 2023, meaning the Ponders had to arrange childcare for H.P. so that they could attend the meeting.

22. At the September 11, 2023, meeting, AMS stated that they "interpret behavior differently from the normative." Ms. Gonzalez diagnosed H.P. with "undeveloped will" and provided her medical treatment plan. The medical treatment plan required that the Ponders follow a specific routine, recommending that they "modify the time each family member goes to bed and wakes up." The treatment plan instituted rules for speaking to H.P. The treatment plan forbade the Ponders from walking to school and required that H.P. arrive by car at exactly 8 am daily.

23.     Ms. Gonzales informed the Ponders that H.P. would only be allowed to attend school until 10 am, until the next treatment meeting in two weeks. During this two-week period, Gonzalez and AMS would treat H.P.'s condition and Gonzalez would determine if H.P. made medical progress in his treatment that would allow H.P. to attend until noon, not the contracted 3:15 pm. They required that the school counselor Leslie Grove observe H.P. Gonzalez stated that the treatment plan would "break the habit" of H.P. being in distress. Gonzalez also demanded that the Ponders always keep their phones on to accommodate immediate pickups when AMS required it.

24.     On September 12, 2023, Leslie Grove notified the Ponders that she would observe H.P. on September 18, 2023, and that she wanted to schedule a conference to discuss H.P. with the Ponders. This was scheduled for September 27, 2023.

25.     On September 15, 2023, the Ponders requested an update on H.P. and asked if he could gradually leave a little later. Gonzalez informed the Ponders that this would not be an option.

26.     Another meeting was scheduled on Thursday, September 21, 2023 to discuss the progress of H.P.'s medical treatment. However, on September 21, 2023, Jinny Gonzalez emailed the Ponders stating that AMS had to cancel the meeting due to being very busy. They agreed to reschedule the meeting to September 26, 2023, and to move the pick-up time for H.P. the following week to allow him to stay until 10 am on Monday and Tuesday, 10:30 am on Wednesday and Thursday and 11 am on Friday.

27.     On October 2, 2023, Lesley Williams, H.P.'s teacher, informed the Ponders that H.P. had been improving and had "the best day at school so far." There was no concern that he had behavioral issues that the school could not address. His time at the school was extended to noon each day.

28.     Gonzalez's treatment included hiring an occupational therapist to work with H.P. At the

recommendation of Jinny Gonzalez, the Ponders hired Jennie Buckley but later determined she was not an occupational therapist. Further, she recommended unnecessary therapy, such as vision therapy. This caused a delay in getting H.P. an OT evaluation.

29.    On December 20, 2023, Leslie Grove, the school psychologist, observed H.P. and found that he was doing very well. She noted that she would not be connecting with AMS administration until late January to discuss her findings. Regardless, and without waiting for their own psychologist's assessment, on January 5, 2024, Jinny Gonzalez instructed that H.P. no longer be allowed at the school past 11 a.m. Again, the contractual terms and payments were for full day coverage, not a two- or three-hour drop off. The school informed them that they had additional new children and due to accommodating them, they would need to pick up H.P. early each day until AMS was able to adapt to the new students.

30.    On January 23, 2024, AMS informed the Ponders that they were "changing things" and would not accommodate H.P. attending for more than a few hours each day at that time.

31.    On January 31, 2024, Ross Ponder's brother became ill and died March 5, 2024. AMS denied a request to allow H.P. to stay when Ross had to leave town before his brother's life support was pulled and was unable to pick him up at 11:45 am.

32.    H.P. had his initial OT evaluation on April 26, 2024. The school agreed to meet and discuss on May 17, 2024. At the May 17, 2024, meeting, the Ponders reported on the OT evaluation. The Ponders requested that H.P. be transitioned to extended day, as they had contracted for full-time school. The school refused to allow H.P. to go full-time in June and stated that they would need to wait for an evaluation in July when his teacher returned from vacation. It was evident that the school had staffing issues that needed to be addressed.

33.    On July 2, 2024, immediately upon her return from vacation, Ms. Williams, H.P.'s teacher,

communicated with the Ponders and stated that H.P.'s day should be extended to 12:30 pm.

34. By July 30, 2024, it was becoming more evident that AMS had serious staffing issues. Jinny Gonzalez sent multiple communications to all the families at AMS notifying them of staffing changes. While the plan was for H.P. to begin transitioning to full day school, AMS continued to ask for him to be picked up early. Additionally, AMS began requiring that R.P. to also be picked up early. Further, according to AMS staff, at times there were as many as 39 children in the nap program called Casita.

35. The teachers/Guides were clearly working without enough support and even disclosed their stresses and personal medical information regarding hormonal changes to the children through discussions highly abnormal and inappropriate to have with young students.

36. While Montessori teachings allow students to be given guidance and redirection, they do not punish. However, AMS allowed the stressed teachers to punish children and classes. Access to water bottles were restricted to an entire class as a punishment and students were encouraged to go into the bathroom often without the lights on, as a normalized way of isolating children from the classroom for being "too loud."

37. On September 11, 2024, the Ponders notified the school that the family's beloved dog was actively dying of cancer and would likely die in the next 1-3 days.

38. On September 12, 2024, Jinny Gonzalez again provided notice to all the families of staffing concerns.

39. On September 12, 2024, an AMS administrator called the Ponders at noon, stating that the youngest Ponder child, R.P., would need to be picked up early because she was not sleeping in Casita, something that had not previously been disclosed and was not a problem before or after R.P.'s time at AMS The Ponders were dealing with a different emergency in their home–the death

of their terminally ill German shepherd and desire to remove the animal's body prior to the children returning home. AMS was unwilling to provide any concession regarding their demand to pick up regardless of what the family was managing at the home that day.

40. On September 13, 2024, AMS again requested that both children be picked up early. Again, there were significant staffing issues at AMS.

41. On November 22, 2024, Jinny Gonzalez scheduled a meeting regarding H.P.'s progress under her medical treatment plan for December 5, 2024. The Ponders informed AMS that H.P. would be going to the doctor to determine if he had ADHD, which directly conflicted with Ms. Gonzalez's treatment plan and diagnosis.

42. On December 3, 2024, H.P. was formally diagnosed with ADHD. The Ponders provided the diagnosis and medical documentation to AMS immediately.

43. On December 5, 2024, at the scheduled meeting to discuss H.P.'s progress and accommodations, Jinny Gonzalez stated that she did not think that AMS was the right school for H.P. Ms. Gonzalez stated that she did not believe in diagnosing or medicating a child for ADHD and did not approve of the treatment plan from H.P.'s actual physician. In fact, with the support of AMS, Gonzalez specifically discussed her own medical plan, stating the need to override the diagnosis of an actual doctor. AMS shortened H.P.'s days to half days.

44. On December 7, 2024, H.P. was started on ADHD medication, which had very positive effects. The Ponders requested that H.P. receive new evaluations by AMS to determine the effects of the new medication, which they had found effective at home.

45. On December 16, 2024, the Ponders met with Baker and School Advisor, Jeff Schneider. Mr. Baker agreed to delay enrollment decisions for H.P. until the middle of the spring semester and to provide regular updates about how H.P. was performing in school, including the response

to medication.

46. However, from December 16, 2024, to January 27, 2025, AMS refused to provide feedback. The Ponders made repeated requests to meet to discuss H.P. and requested that Gonzalez be taken off the team, due to her alternative medical diagnosis and treatment and disregard of H.P.'s licensed pediatrician and faculty member at Dell Medical School.

47. On January 17, 2025, Baker sent correspondence stating that AMS would not be offering an enrollment contract for the following year to H.P. Mr. Baker also chastised the Ponders for requesting that Gonzalez be removed from H.P.'s case, stating AMS's support for Gonzalez and her quack medicine, dismissing the parent and pediatrician input and advice.

48. On January 24, 2025, the Ponders met with Mr. Baker and Mr. Schneider. The Ponders highlighted communication issues, the lack of communications with parents and the systematic barriers that prevented parents from being informed of concerns regarding their children, noting many parents shared these concerns. Mr. Baker informed them in this meeting that not only was H.P. not allowed to return next semester, that AMS was expelling H.P. on February 7, 2025.

49. On January 24, 2025, the Ponders filed a complaint with the Texas Health and Human Services based on their experiences and after reviewing AMS's most recent HHS inspection in October 2024, which recorded deficiencies in recordkeeping, naptime, and operational policies regarding suspension and expulsion. The Ponders also requested to receive copies of these relevant records and policies but were denied by AMS. The fact that this complaint was filed was made known to AMS on January 25, 2025.

50. On January 28, 2025, Baker emailed to inform the Ponders that all the Ponder children would be expelled if the Ponders did not follow the demands of AMS, including following the medical treatment plan created by Gonzalez.

51. The same day, the Ponders informed the other school parents of the ongoing issues in a WhatsApp post, in an effort to make changes intended to help all students gain community support and raise concerns. The WhatsApp group was a private, optional, parent-run platform that was not associated with the school administration and with a minor fraction of the school's parents actively participating. The school had no right to limit speech in this forum or have an opinion about a forum not inclusive of the school or faculty. This would be akin to the school trying to limit conversations between parents in a home, church or any other off property location.

52. On January 29, 2025, the Ponders received H.P.'s initial evaluation from Austin ISD. AISD determined that H.P. would be placed in a standard classroom with minor accommodations and did not need a special education classroom, occupational, speech, or vision therapy. The results were immediately distributed to AMS and the Ponders requested a meeting.

53. On January 30, 2025, Baker sent a letter to all parents, guardians, and staff at AMS stating that the information provided by the Ponders was "misleading" and that "false claims" were made. The statements made were derogatory and caused the Ponders financial harm. The decision to expel all three children was made on or before the same day.

54. A coffee was held at 8:30 AM on January 31, 2025, at the Ponders' home to further discuss systematic communication issues affecting many students at AMS. At 5:45 PM on January 31, 2025, AMS terminated the enrollment of all three children. It was stated by AMS that the terminations occurred because the Ponder parents' "actions were detrimental to the school." Clearly the actions referred to are the filing of the HHS complaint and reaching out to other parents to discuss the communication concerns. The termination of the Ponder children was retaliation.

55. The impact on the family has been extreme. While attending the school, the quack

medicine diagnosis and treatment plan instituted by Gonzalez caused H.P. harm.

56. H.P. has suffered extreme anxiety, mental anguish and distress at the hands of AMS. The level of torture he experienced was not understood until he was placed in a new school, where he is thriving. The Montessori teaching is to provide peaceful development, particularly from ages three to six, something that AMS did not provide the Ponder children.

57. The malicious punishments and unreasonable demands made of H.P. and the Ponders caused chaos, anxiety, and disruption of the entire family. The Ponders' entire lives were dismantled, as the school would call with less than 15 minutes notice and demand that a child be picked up. They were no longer allowed to follow their chosen morning routine.

58. Further, the Ponders were forced to spend thousands of dollars on treatments that Gonzalez prescribed to treat her diagnosis of H.P. with "underdeveloped will." These treatments were not necessary or beneficial to treat H.P.

59. Due to the change in hours, the Ponders ability to work full-time was severely impacted, clearly impacting their earning abilities.

60. Sarah Ponder's career was damaged by the actions of Defendants. Some of her clients received the letter, causing at least one to terminate the relationship.

61. The expulsion and the entire AMS experience caused extreme mental anguish for the entire family. The Ponder children have faced severe emotional distress in having to change schools. They were not able to be immediately placed in school, causing educational disruption.

## V. CAUSES OF ACTION

### A. Count 1- Negligence

62. Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

63. The occurrences made the basis of this suit, and the resulting injuries and damages of the

Plaintiffs were proximately caused by the negligent conduct of the Defendants. Defendants were negligent by breaching the duty that was owed to the Plaintiffs, to exercise ordinary care in one or more of the following acts or omissions, constituting negligence:

> a. Failing to exercise the care necessary under the circumstances;
>
> b. Failing to do what a reasonable daycare would have done under the circumstances;
>
> c. Failing to intervene to ensure a child's safety;
>
> d. Failing to provide proper supervision;
>
> e. Failing to properly hire, qualify, train and supervise its employees;
>
> f. Failing to provide reasonable accommodations; and
>
> g. Failing to adhere to the Texas Minimum standards for childcare.

64. Defendants had a duty to exercise ordinary care in caring for and supervising the children in its care so as to prevent injury to Plaintiffs H.P., R.P. and L. P.

65. Defendants had a duty to maintain a safe environment for children in its care.

66. Defendants had a duty to hire, train, and supervise caregiver employees to ensure children were not subjected to inappropriate medical treatments or action plans and to prevent injury to Plaintiffs and other children similarly situated.

67. Defendants breached the duty of care by failing to care for the children, failing to supervise the children, failing to use positive methods of discipline, failing to stop discrimination, failing to provide accommodations, and failing to properly train, hire, and supervise its employees.

68. Defendants' negligent acts and/or omissions, and breach of duties, directly and proximately caused injury to Plaintiffs, which resulted in significant damages.

**B. Count 2- Negligence Per Se**

69. Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

70. Defendants failed to exercise the mandatory standard of care in violation of the minimum standards for childcare.

71. Texas law requires that discipline be positive and encourage self-esteem, self-control, and self-direction. 26 TAC 744.501. Refusal to provide water and putting children in dark bathrooms is not appropriate punishment.

72. AMS failed to encourage the Ponder children to express feelings and failed to give appropriate attention. 26TAC 746.2601 When H.P. was upset or speaking loudly he was sent to a bathroom, sometimes without lights on.

73. AMS failed to comply with the regulations regarding nap times and food service for H.P. 26 TAC Sec. 746.2901-2911; 26 TAC Sec. 746.3301-3321. H.P. and R.P. were forced to nap for more than an hour. H.P. was not allowed to have unhurried meals.

74. Under Tex. Occ. Code §§ 151.002(13), 165.152, any person who diagnoses or treats a physical or mental condition without a license commits a statutory violation. By diagnosing H.P. to have an "underdeveloped will," prescribing a treatment plan, monitoring the child's response, and usurping a licensed physician's authority, Gonzalez engaged in the unlicensed practice of medicine. Plaintiffs are in the class the statute protects (patients and parents), and the statutory breach proximately caused their injuries.

75. AMS and Baker aided and abetted this unlawful medical practice by providing institutional support, refusing to curtail Gonzalez's medical interventions, and explicitly defending her unauthorized medical decision-making authority over licensed medical professionals. Plaintiffs were, at all times, members of the class that the statutes the Defendants violated were designed to protect.

76. Defendants' violation of the statutes were the proximate cause of Plaintiffs' injuries.

77. As a result of the Defendants' illegal acts and/or omissions in violating the statues Plaintiffs sustained injuries.

**C. Count 3- Gross Negligence**

78. Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

79. Defendants' conduct was more than momentarily thoughtlessness or inadvertence. Rather, the acts and/or omissions by Defendants constitute gross negligence as defined in the Texas Civil Practice and Remedies Code.

80. Defendants' conduct involved an extreme degree of risk, considering the probability and magnitude of potential harm to the Plaintiffs. Defendants had actual, subjective awareness of the risk involved, but, nevertheless, proceeded in conscious indifference to the rights, safety, and/or welfare of the Plaintiffs and/or other similarly situated individuals. Plaintiffs suffered damages and further seek punitive damages.

**D.  Count 4- Negligent Activity**

82. Plaintiffs incorporate the above paragraphs by reference as if stated fully herein.

83. Defendant AMS is the owner, operator and possessor of the daycare premises.

84. Plaintiffs H.P., R.P., and L.P. were minor children placed in the care of Defendants and thus an "invitee" to whom Defendants owed a duty to exercise reasonable care.

85. Defendants owed a legal duty to ensure the Plaintiffs' safety, ensuring employees are necessarily hired, trained, supervised, and terminated in order to maintain a safe environment for children.

86. Such negligent activity on the part of Defendants proximately caused the injuries and other damages suffered by Plaintiffs.

**E. Count 5- *Respondeat Superior***

87. Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

88. The negligence, carelessness, and callousness of Defendant AMS's employees proximately caused the damage and loss suffered by Plaintiffs. At all times material to this action, Defendant AMS's employees were acting in the course and scope of their employment. Accordingly, Defendants may be held responsible for its employees' negligence under the doctrine of *respondeat superior*.

**F. Count 8-Breach of Contract**

89. Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

90. Plaintiffs had entered a valid contract for the provision of childcare services for their three minor children. There was a meeting of the mind, evidenced by the signing of the contracts, applications, and general paperwork generated by Defendant AMS.

91. Plaintiffs tendered performance according to the terms of the contract.

92. Defendant AMS breached its duties and obligations under the contract, both explicit and implicit, pertaining to providing appropriate care, custody, and supervision by all acts stated above.

93. Defendant AMS's breach was the proximate cause of damages to Plaintiffs, both direct and incidental/consequential.

94. Further, Plaintiffs seek to recover their attorney fees under the Texas Civil Practices and Remedies Code.

**G. Count 9- Fraud**

95. Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

96. Plaintiffs discovered that Defendants had been defrauding them by making promises and commitments to get Plaintiffs' money, knowing the statements were false and that they had no intention of fulfilling.

97. Defendants made material misrepresentations that were false. Defendants knew these statements were false or they were made recklessly without any knowledge of the truth and as a positive assertion.

98. Defendants made the statements with the intention that Plaintiffs would act upon it and Plaintiffs acted in reliance of the representations and causing injury, damages, and harm.

99. Plaintiffs seek treble damages and attorney fees.

**H. Count 10- Fraudulent Inducement to Contract and Breach of Contract**

100. Plaintiffs incorporate by reference the above paragraphs by reference as if stated fully herein.

101. The Ponders enrolled all their children at AMS because AMS stated that they followed the Montessori teaching paradigm and that they would offer full-day schooling for the three children, from 8 am to 3 pm. The Ponders relied on these assertions when entering into contracts with AMS. The Ponders were further induced to re-enroll for a second year.

102. AMS further promised to guide students to their fullest potential using the Montessori principles of independence, self-discipline, and social belonging. These principles were not utilized.

103. The AMS parent handbook, adopted into the contract, outlines procedures for programmatic changes and communication that were not followed by AMS. The AMS parent handbook states that AMS will work in partnership with the parents. AMS refused to provide information, observations, or inform them of incidents at the school.

104. AMS fraudulently induced the Ponder family to contract for all three children's education. AMS breached its contracts with the Ponders by failing to allow the children to receive full day education, failing to follow the school policies, and failing to follow Montessori

teachings.

105. As a result of Defendants' fraudulent inducement, Plaintiffs suffered harm, injury and damages. Further, Plaintiffs seek attorney fees and treble damages.

### I. Count 11- Civil Conspiracy

106. Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

107. Defendants acted in combination to seek or accomplish a course of action to commit unlawful acts. There was a meeting of the minds of the Defendants to agree to accomplish the above stated unlawful acts. Defendants were aware of the intended harm or wrongful conduct at the outset of the combination or agreement. As a result, Plaintiffs suffered harm, injury and damages.

### J. Count 12- Retaliation

108. Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

109. AMS allowed Defendant Gonzalez to make these unfounded commands and fully protected her quack medicine. Defendants expelled H.P. in retaliation for Plaintiffs' questioning of Gonzales's medical treatment plan and for seeking a true medical diagnosis that was inconsistent with her plan.

110. Defendants retaliated against the Ponders for the filing of a complaint with the HHS and for discussing concerns in the WhatsApp Parent Group by expelling the Ponder children. As a further act of retaliation, AMS chose to send an email to the entire school email list, including parents, caregivers, faculty and staff, making defamatory statements against the Ponders to all families at AMS.

## VI. DAMAGES

111. Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

112. Defendants' acts and omissions jointly and singularly, were the proximate cause of injuries to Plaintiffs, including but not limited to:

   1. Loss of value of the tuition/fees that Plaintiffs paid for the childcare;
   2. Loss of wages for Mr. and/or Ms. Ponder incurred by having to stay home and care for their children when sent home early and later when expelled;
   3. Medical expenses for the reasonable and necessary examination of H.P.;
   4. Medical expenses for the reasonable and necessary therapy for Plaintiffs;
   5. The cost of the inappropriate medical treatment prescribed by Gonzales;
   6. Physical pain and suffering in the past;
   7. Mental anguish in the past;
   8. Mental anguish, in reasonable probability, sustained in the future;
   9. Lost wages in the past;
   10. Lost wages, in reasonable probability, sustained in the future;
   11. Loss of wage-earning capacity in the past;
   12. Loss of wages/earning capacity, in reasonable probability, sustained in the future;
   13. Loss of normal enjoyment of the pleasure of life in the past;
   14. Loss of normal enjoyment of the pleasure of life, in reasonable probability, sustained in the future;
   15. Treble damages;
   16. Punitive damages;
   17. Pre-judgment and post-judgment interest;
   18. Court costs;
   19. Reasonable and necessary attorney fees; and

20. Costs of suit.

## VII. CONDITIONS PRECEDENT

113. All conditions precedent have been performed or occurred, except for mediation which is addressed below.

## VIII. JURY DEMAND

114. Plaintiffs respectfully demand the right to have a trial by jury and have tendered the jury fee in Travis County District Court.

## IX. PRAYER

WHEREFORE, Plaintiffs pray that Defendants be cited to appear and answer, and that on final trial Plaintiffs have and recover:

1. Judgment against Defendants for a sum in excess of the minimum jurisdictional limits of this Court;
2. Pre-judgment at the highest legal rate;
3. Reasonable and necessary attorney's fees;
4. Taxable Court costs;
5. Post-judgment interest on the above amount at the highest legal rate; and
6. Such other and further relief to which Plaintiffs may show themselves justly entitled in law or equity.

Respectfully submitted,

**WELBORN LAW LLC**
8712 Mesa Suite B206
Austin, Teas 78759
Telephone: (512) 825-3390

By: */s/ Amy C. Welborn*
    Amy C. Welborn
    State Bar No. 24012853
    amy@welborn-law.com

**ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record are being served with a copy of the foregoing document via the Court's CM/ECF system on 11th day of June 2025.

*/s/ Amy C. Welborn*
Amy C. Welborn
