# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISON**

| | | |
|---|---|---|
| **ROSS PONDER AND SARAH PONDER,** | § | |
| **INDIVIDUALLY, AND AS NEXT FRIEND** | § | |
| **OF H.P., L.P., and R.P., MINORS,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 1:25-cv-00615 ADA-SH** |
| | § | |
| **AUSTIN MONTESSORI SCHOOL, INC.;** | § | |
| **RONALD GRAE BAKER, INDIVIDUALLY;** | § | |
| **and JINNY GONZALEZ, INDIVIDUALLY,** | § | |
| **Defendants.** | § | |

**PLAINTIFFS' UNOPPOSED FIRST AMENDED MOTION TO REMAND**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND................................................................................ 1

III.    ARGUMENTS AND AUTHORITIES................................................................. 3

        A.  Standard of Review............................................................................... 3

        B.  The Forum Selection Clause Requires Remand. .......................................... 4

        C.  The Forum Selection Clause Requires Remand. .......................................... 4

        D.  The Forum Selection Clause Constitutes a Clear Waiver of Removal. ......................... 8

IV.     CONCLUSION AND PRAYER ..................................................................... 9

**TABLE OF AUTHORITIES**

**Cases** ........................................................................................................... **Page(s)**

*Aguas Lenders Recovery Grp. V. Suez, S.A.*, 585 F.3d 696 (2nd Cir. 2009) ................................. 7

*AMMCO v. Romano*, 42. F.Supp. 3d 700 (E.D. Penn 2014) ......................................... 7

*Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972) ....................................... 6

*Buck v. Blum*, 130 S.W.3d 285 (Tex.App.Houston [14th Dist.] 2004, no pet.) ........................... 7

*Citro Florida, Inc. v. Citrovale, S.A.*, 760 F.2d 1231 (11th Cir.1985) .......................... 5

*City of New Orleans v. Mun. Admin. Servs., Inc.*, 376 F.3d 501 (5th Cir. 2004) ......................... 6

*City of New Orleans v. Municipal Administrative Services, Inc.*, 376 F.3d 501 (5th Cir. 2004) ... 8

*Excell, Inc. v. Sterling Boiler & Mech., Inc.*, 106 F.3d 318 (10th Cir. 1997) ................................ 5

*Global Satellite Communication Co. v. Starmill U.K. Ltd.*, 378 F.3d 1269 (11th Cir.2004) ......... 6

*Grand View PV Solar Two, LLC v. Helix Elec., Inc.*, 847 F.3d 255 (5th Cir. 2017) ................. 5, 8

*In re: Fraser*, 75 F. Supp. 2d 572 (E.D. Tex. 1999) ....................................... 3

*Lamar County Elec. Coop. Ass'n v. McInnis Bros. Constr., Inc.*, No. 4:20-CV-930, 2021 WL
1061188 (E.D. Tex.), aff'd, 2022 WL 476086 (5th Cir.) .......................................... 5

*Manguno v. Prudential Property & Ca. Ins. Co.*, 276 F.3d 720 (5th Cir. 2002) ........................... 3

*Nelson v. St. Paul Fire & Marine Ins. Co.*, 897 F. Supp. 328 (S.D. Tex. 1995) ........................... 3

*Royal Canin U.S.A. v. Wullschleger* 145 S. Ct. 604 US 22 L.Ed. 2d 289 (2025) .......................... 3

*Stewart v. Ricoh Corp.*, 487 U.S. 22 (1988), at 108 S.Ct. 2239 ....................................... 6

*Texas Medicine Resources, LLP v. Molina Healthcare of Texas, Inc.*, 356 F. Supp. 3d 612 (N.D.
Tex. 2019) (citing *Union Planters Bank Nat'l Ass'n v. Salih*, 369 F.3d 457 (5th Cir. 2004)) ... 3

*Texas Medicine Resources, LLP*, 356 F. Supp. 3d at 616 .............................................. 3

*Vantage Trailers v. Beall Corp.*, 567 F.3d 745 (5th Cir. 2009) ....................................... 3

**Statutes**

28 U.S.C. §1447 ........................................................................................................................ 2

## I.    INTRODUCTION

1.    This action was originally filed in 345th Judicial District Court of Travis County, Texas under Cause Number D-1-GN-25-002212, on March 28, 2025.

2.    On April 24, 2025, Defendants, Austin Montessori School, Inc.; Ronald Grae Baker; and Jinny Gonzalez, removed this action to this Court claiming Federal Question Jurisdiction.

3.    Plaintiffs, after doing additional investigation, filed a First Amended Complaint.  This complaint removed the claims for violations of the ADA and/or discrimination, violations of 504, and some of the state court statutes referenced in negligence per se.

4.    Plaintiffs now move this Court to remand this action to the 345th Judicial District Court of Travis County, Texas, because (1) the amended petition contains only state law claims, with no federal question and (2) the underlying contract contains a valid and enforceable forum selection clause requiring any action related to the contract to be brought in Travis County, Texas.

5.    Defendants agree to remand the matter to the Travis County District Court. The case was removed on federal question jurisdiction.  The federal claims have been removed in the First Amended Petition, meaning the case does not arise from Constitutional or federal claims.

6.    The Court lacks federal question jurisdiction, meaning the Court does not have subject matter jurisdiction over the case and it must be remanded to Travis County District Court.

## II.    FACTUAL BACKGROUND

7.    This matter arose from a dispute between the parties involving the selection of the Defendants' school for the Plaintiffs minor children to attend, the minor Plaintiffs' enrollment, attendance, and subsequent expulsion from Austin Montessori School ("AMS").  The claims involve breach of contract, fraud, and fraudulent inducement regarding the programing available at the school. The claims involve the unauthorized practice of medicine by the Defendants,

negligence and gross negligence in the operation of a school under the Texas state minimum standards, and retaliation. All of these claims are state law claims. See, Exhibit A, Plaintiffs' First Amended Complaint.

8.      The Ponders first enrolled at AMS in August of 2023. The Ponders were fraudulently induced into the enrollment contract, being told a rare enrollment opportunity had become available offering full time enrollment until 3 pm each day, that the school followed Montessori teachings, complied with all state laws, and that the school could accommodate the educational needs of their children. Each school term they would enter into a contractual agreement with AMS to provide educational services.

9.      Defendants then breached the contract and refused to provide the contracted for number of hours of enrollment. Defendants began calling Plaintiffs and making them pick up their children from school as early as two hours after arrival.

10.     Defendant Gonzalez diagnosed Plaintiff H.P. with a medical condition and created a medical treatment plan and Defendants began treating him, even though the school is not a medical office and Defendant Gonzalez has no medical training. Defendants required Plaintiffs to seek additional treatment for H.P. Plaintiffs subsequently learned that H.P. suffered from ADHD and not the medical condition created by Defendants.

11.     When Plaintiffs voiced their concerns over the actions of Defendants, the Defendants retaliated and expelled all three of the Plaintiffs' children.

12.     Plaintiffs, as per the contract, attempted pre-suit mediation. When Defendants refuse to participate, the Plaintiffs were forced to file the state court action on March 28, 2025. The Plaintiffs then filed a Motion to Compel Mediation to enforce the mediation provision of the contract. Instead of agreeing to the mediation, to further delay, Defendants removed this case to

Federal Court.

13.     Plaintiffs' Motion to Remand is timely as it has been filed within the 30-day period allowed by 28 U.S.C. §1447.

### III.    ARGUMENTS AND AUTHORITIES

#### A.    Standard of Review.

12.     Federal courts are courts of limited jurisdiction and can only hear cases permitted under Article III of the Constitution and through a "jurisdictional grant authorized by Congress." *In re: Fraser*, 75 F. Supp. 2d 572, 576 (E.D. Tex. 1999). Federal courts are "duty-bound to examine their own subject-matter jurisdiction and may not proceed where it is apparent that jurisdiction does not exist." *Texas Medicine Resources, LLP v. Molina Healthcare of Texas, Inc.*, 356 F. Supp. 3d 612, 615 (N.D. Tex. 2019) (citing *Union Planters Bank Nat'l Ass'n v. Salih*, 369 F.3d 457, 460 (5th Cir. 2004)).

13.     When a removal is challenged, the Court must first determine if there is a statutory basis or removal under 28 U.S.C. Sec. 1441-1443.  Upon challenging removal, "the burden of proof falls on the party claiming jurisdiction, and the showing must be made by a preponderance of the evidence." *Vantage Trailers v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir. 2009). Additionally, "any ambiguities are construed against removal because the removal statute should be strictly construed in favor of remand." *Manguno v. Prudential Property & Ca. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002). Any "doubts regarding whether removal jurisdiction is proper should be resolved against federal jurisdiction." *Texas Medicine Resources, LLP*, 356 F. Supp. 3d at 616. If subject matter jurisdiction does not exist, "a federal court must remand the suit to the state court where it originated." *Nelson v. St. Paul Fire & Marine Ins. Co.*, 897 F. Supp. 328, 330 (S.D. Tex. 1995).

**B.    The Forum Selection Clause Requires Remand.**

14.    Supreme Court ruled in *Royal Canin U.S.A. v. Wullschleger,* that an amended complaint holding, "a post-removal amendment excising all federal claims destroys federal jurisdiction." 145 S. Ct. 604 US 22, 220 L.Ed. 2d 289 (2025).  The Supreme Court held that federal jurisdiction depends on the allegations in the operative pleading. *Id.*  When an amended complaint eliminates any federal claims in a case removed based on federal-question jurisdiction, a federal court cannot exercise supplemental jurisdiction over the state-law claims that are left. *Id.*  The Supreme Court observed that the plaintiff is the master of the complaint and may decide which claims are brought, and against which parties, and therefore whether or not there is a basis on which a federal court may exercise its subject-matter jurisdiction.  *Id.*

15.    In the case at hand, all Federal claims were dismissed from the First Amended Petition. The remaining claims are only state law claims, including, but not limited to, claims for negligence, negligence *per se*, gross negligence, negligent activity, *respondeat superior*, breach of contract, fraud, fraudulent inducement to contract, civil conspiracy, and retaliation. Further, some claims involve the unauthorized practice of medicine, which is specifically governed by the state.

16.    Federal question jurisdiction no longer applies to the case, as  no federal claims exist and the Court can not exercise supplemental jurisdiction over the remaining state-law claims.

**C.    The Forum Selection Clause Requires Remand.**

17.    The Parties entered into a contract on or about January 17, 2024, which governs the subject matter of this dispute. A true and correct redacted (public version) copy of the contract for H.P. is attached hereto as Exhibit 1 to Exhibit A, Plaintiffs' First Amended Complaint.

18.    The contract contains a forum selection clause.  The clause at issue provides:

"In the event of litigation, the venue of any action hereunder shall lie exclusively

within the Circuit Court of Travis County, Texas, and the parties hereto consent to

personal jurisdiction and expressly waive all right to trial by jury."

Dkt. 9-2, ¶ 12. This is not merely a geographic designation. The clause unambiguously designates

the exclusive venue for any dispute as a specific court—the "Circuit Court of Travis County,

Texas." The use of the term "exclusively within the Circuit Court" conveys an intention to select

a particular forum, not merely a location.

19.     The phrase "within the Circuit Court of Travis County" is not ambiguous or geographic,

relying on *Lamar County Elec. Coop. Ass'n v. McInnis Bros. Constr., Inc.*, No. 4:20-CV-930, 2021

WL 1061188 (E.D. Tex.), aff'd, 2022 WL 476086 (5th Cir.).

20.     In *Lamar County*, the clause used the word "in" to describe a geographic district. Here, by

contrast, the clause expressly references a court—not a geographic area—making it a forum

designation, not a mere reference to locale. The use of the word "exclusively" underscores the

intent to restrict jurisdiction, not merely location.

21.     Although Texas does not have a "Circuit Court of Travis County, Texas," the reasonable

interpretation is that the parties intended to refer to a trial-level court in Travis County—i.e., the

Texas District Court or County Court. Courts routinely enforce forum selection clauses that

contain such minor misnomers, focusing on intent rather than formality. *See Excell, Inc. v. Sterling

Boiler & Mech., Inc.*, 106 F.3d 318, 321 (10th Cir. 1997) (interpreting "exclusive jurisdiction" in

"district court of El Paso County, Colorado" to mean state court, not federal).

22.     Even if the phrase "Circuit Court of Travis County" is imprecise or uncommon in Texas,

it plainly does not refer to the United States District Court for the Western District of Texas, which

is a federal court, not a court "of Travis County." The United States District Court sits in Travis

County, but it is not a court of Travis County. "Where [a forum selection clause] grants exclusive

jurisdiction to the "the Courts of Texas," it is referring to Texas state courts, not just courts located in Texas." *Grand View PV Solar Two, LLC v. Helix Elec., Inc.*, 847 F.3d 255, 258 (5th Cir. 2017) (quoting *Dixon v. TSE Int'l, Inc.*, 330 F.3d 396, 398 (5th Cir. 2003) (per curiam)). Therefore, the forum selection clause is referring to the County Court of Travis County, Texas—a state court.

23.     It has been previously decided that where there is ambiguity in a forum selection clause "an interpretation is preferred which operates more strongly against the party from whom the words proceeded." *Citro Florida, Inc. v. Citrovale, S.A.*, 760 F.2d 1231, 1232 (11th Cir.1985).

24.     Additionally, in *Global Satellite Communication Co.*, the language in the forum selection clause of the contract is similar to that of this case—it names a geographical location, "host to several forums." However, the Court found it appropriate to construe the verbiage against the drafter as well. *Global Satellite Communication Co. v. Starmill U.K. Ltd.*, 378 F.3d 1269, 1274 (11th Cir.2004).

25.     Further, the use of the term "exclusively" forecloses any construction that would allow for parallel federal jurisdiction. The Fifth Circuit has recognized that language specifying actions "shall be brought in [a state court]" operates as a waiver of removal rights. *See City of New Orleans v. Mun. Admin. Servs., Inc.*, 376 F.3d 501, 504 (5th Cir. 2004). Likewise, this clause contains mandatory language specifying the exclusive forum and should be enforced as such.

26.     Moreover, "where venue is specified [in a forum selection clause] with mandatory or obligatory language, the clause will be enforced." *Paper Express, Ltd. v. Pfankuck Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir.1992). In this instance, use of the word "shall" and "exclusively" makes it a mandatory forum selection clause.

27.     It is well-established that forum selection clauses, that are a vital part of the contract, are binding on the parties "unless the respondent can meet the heavy burden of showing that its

enforcement would be unreasonable, unfair, or unjust." *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972). Additionally, forum selection clauses are *"prima facie* valid." *Id* at 10.

28.     Moreover, 28 U.S.C. §1404(a) "governs the District Court's decision whether to give effect to the parties' forum selection clause," and the forum-selection clause must be "given controlling weight in all but the most exceptional cases." *Stewart v. Ricoh Corp.*, 487 U.S. 22 (1988), at 32, 33, 108 S.Ct. 2239. As the parties bargained-for this forum selection clause, the enforcement "protects their legitimate expectations and furthers vital interests of the justice system." *Id* at 33.

29.     The forum selection clause also applies to the individual employees that have been named individually, while acting in the course and scope of their employment, which was to fulfil the services for which the Plaintiffs contracted.  The individuals named in the action through the Close Relationship Doctrine which is used to prevent, "parties to contracts from using evasive, formalistic means lacking economic substance to escape contractual obligations." *Aguas Lenders Recovery Grp. V. Suez, S.A.*, 585 F.3d 696, 701 (2nd Cir. 2009). The individuals named in this action are employees of Austin Montessori School and these claims arise from work done in the course and scope of their employment. "'The typical *respondeat superior* claim involves an allegation of negligence on the part of the employee'" occurring within the course and scope of the employee's employment." *Buck v. Blum*, 130 S.W.3d 285, 288 (Tex.App.Houston [14th Dist.] 2004, no pet.). "The close relationship arises directly from benefits that the…Defendants derived from the…contractual relationship." *AMMCO v. Romano*, 42. F.Supp. 3d 700, 709 (E.D. Penn 2014). "Even though they are non-signatories, [they] are nevertheless bound to the forum-selection clauses, having apparently been created and operated by a signatory to engage in activities covered by the agreements." *Fitness Together Franchise, L.L.C. v. EM Fitness, L.L.C.*, No. 1:20-cv-02757-DDD-STV, 2020 WL 6119470 (D. Colo. Oct. 16, 2020). In the case at hand, the individuals named

in this action benefit from a close relationship with Defendant AMS through *respondeat superior*. Therefore, the individuals named in this action are also bound by the terms of the Contract.

30.     The forum selection clause in the contract between Plaintiffs and Defendants is valid and enforceable. It clearly and unambiguously designates the Travis County District Court as the exclusive forum for any action arising out of or relating to the contract.  Plaintiffs' claims in this action fall squarely within the scope of the forum selection clause, as they directly arise from and relate to the contract. Therefore, the Court should honor the parties' contractual agreement and remand this action to the 345th Judicial District Court, Travis County, Texas.

**D.     The Forum Selection Clause Constitutes a Clear Waiver of Removal.**

31.     It is well established that a party may contractually waive its right to remove a case to federal court. *See Grand View PV Solar Two, LLC v. Helix Elec., Inc.*, 847 F.3d 255, 258 (5th Cir. 2017). A waiver is found where the clause: designates a specific court; uses mandatory language; and does not provide alternative forums. *Id; see also City of New Orleans v. Municipal Administrative Services, Inc.*, 376 F.3d 501, 504 (5th Cir. 2004) ("A party may waive its rights by agreeing to a mandatory, exclusive forum selection clause. In determining whether there has been a waiver, we look to the language of the forum selection clause for a clear and unequivocal expression of the party's intent to litigate in a particular forum."). All of these elements are satisfied here. The clause mandates that venue shall lie exclusively in a named court. While Defendants argue the clause is ambiguous, that position is unsustainable given the directive language used.

32.     The Fifth Circuit has also held that even ambiguity cannot overcome the requirement of a "clear and unequivocal" waiver. See *Grand View*, 847 F.3d at 258. But here, the waiver is not ambiguous—it is explicit in identifying an exclusive venue that does not include this Court.

## IV.    CONCLUSION AND PRAYER

For the foregoing reasons, Plaintiffs respectfully request the Court:

1.  Grant this Unopposed First Amended Motion to Remand.

2.  Remand this action to the 345th Judicial District Court, Travis County, Texas.

3.  Grant such other and further relief, in law or in equity, to which Plaintiffs may be justly
    entitled.

Respectfully submitted,

**WELBORN LAW LLC**
8712 Mesa Suite B206
Austin, Teas 78759
Telephone: (512) 825-3390

By:___*/s/ Amy C. Welborn*_____
    Amy C. Welborn
    State Bar No. 24012853
    amy@welborn-law.com

**ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF CONFERENCE

The undersigned certifies counsel conferred on June 11, 2025, and Defendants' counsel
agreed to the relief sought. Accordingly, this Motion is unopposed.

*/s/ Amy C. Welborn*_____
Amy C. Welborn

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record are being served with a copy of the foregoing
document via the Court's CM/ECF system on 11th day of June 2025.

*/s/ Amy C. Welborn*_____
Amy C. Welborn

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISON

| | | |
|---|---|---|
| ROSS PONDER AND SARAH PONDER, | § | |
| INDIVIDUALLY, AND AS NEXT FRIEND | § | |
| OF H.P., L.P., and R.P., MINORS, | § | |
|     Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:25-cv-00615 ADA-SH |
| | § | |
| AUSTIN MONTESSORI SCHOOL, INC.; | § | |
| RONALD GRAE BAKER, INDIVIDUALLY; | § | |
| and JINNY GONZALEZ, INDIVIDUALLY, | § | |
|     Defendants. | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

COME NOW Plaintiffs, Ross Ponder and Sarah Ponder, Individually and as Next Friend of H.P., L.P. and R.P., minors ("Ponders" or "Plaintiff"), file their First Amended Complaint against Defendant Austin Montessori School, Inc.("AMS"), Grae Baker ("Baker"), and Jinny Gonzalez ("Gonzalez") (collectively "Defendants") and show the Court as follows:

## I. PARTIES

1.    Plaintiffs Ross and Sarah Ponder are the parents of Plaintiff H.P., L.P., and R.P., minors. Plaintiffs reside in Travis County, Texas.

2.    Defendant Austin Montessori School, Inc. is a Texas corporation with its principal place of business at 5006 Sunset Trail, Austin, Texas 78745. Defendant AMS has previously answered and accepted service.

3.    Defendant Ronald Grae Baker is an individual that resides at 10521 Redmond Road, Austin, Texas 78739. Defendant Baker has previously answered and accepted service.

4.    Defendant Jinny Gonzalez is an individual that resides at 2907 Pops Way, Austin, Texas 78745. Defendant Gonzalez has previously answered and accepted service.

## II. JURISDICTION

5.    Subject matter jurisdiction is improper in Federal Court because all the claims are based in Texas law and no Federal claims exist.  Jurisdiction is proper in Travis County District Court.

## III. SUMMARY

6.    The Ponders fully embraced Montessori practices and were excited to have enrolled their children at AMS.  Unfortunately, after enrolling the children, the Ponders learned that AMS does not follow many of the practices of Dr. Maria Montessori and her traditional method, instead using their own practices, which were very harmful to the Ponder children.

7.    Montessori guides are trained to "follow the child" by emphasizing self-directed learning and movement within a prepared environment. Montessori education principles involve the use of collaboration with the parents to create a support plan to best support each child.  Montessori education emphasizes discipline through positive guidance and self-regulation, rather than punishment.

8.    At critical points, Defendants did not collaborate with the Ponders and intentionally prevented information from being shared with parents. Defendants utilized questionable and inappropriate punishments.

9.    Defendants also did not disclose that they adopted their own form of quack medicine used to diagnose and treat their students, in violation of state laws and in opposition of standard medical practices.

10.    AMS fraudulently induced the Ponders into contracts.  When the Ponders questioned the practices of AMS, the children were expelled.

11.    Further, AMS allowed and supported Gonzalez, the Director of Early Childhood Programs, to practice medicine without a license, allowing her to make diagnoses of children, knowing she

had no medical training. Gonzalez "diagnosed" and treated H.P. for "an underdeveloped will." Her prescribed 'treatment plan' included: controlling family medical routines, isolation therapy, dictating parent-child communication, rigid behavioral modification schedules, and specific therapeutic interventions.

12.    To prevent exposure of AMS's quack medical and other practices, AMS refused to provide important information to the parents of the children attending AMS and prevented meaningful parent communication with staff, including information regarding incidents and specifics of the medical treatment. AMS failed to allow the Ponders access to medical, school and treatment records in violation of state law.

13.    The Ponders were repeatedly called to pick up H.P. and/or R.P. without notice and frequently without detailed information regarding an alleged incident.

14.    Upon questioning AMS's quack medicine and lack of communication and bringing these issues to the attention of other family members at AMS and the Texas Health and Human Services, AMS retaliated by expelling the Ponder children.

**IV. FACTS**

15.    The Ponders first enrolled at AMS in August of 2023. The Ponder children had previously thrived in another Montessori environment. The Ponders believed AMS would provide a nurturing supportive environment for their children in keeping with Dr. Montessori's teachings.

16.    The Ponders' enrollment contracts were for an 8 am-3:15 school day (full-time) for all of their children. During the 2023-2024 school year, H.P. and L.P. attended AMS at a cost of $40,555. During the 2024-2025 school year, R.P., H.P., and L.P. attended AMS at a cost of $57,973.50. Attached as Exhibit 1 is a redacted (public version) of a contract for H.P.

17.    The Ponders were required to remain under contract when two children's hours were

reduced.  The reduction in the amount of tuition was minimal (about $3000 a year) and the cost for other care to replace the contracted care was significant, causing financial burden.

18.    H.P.'s first day at AMS was August 17, 2023.   AMS noted that there were no issues when H.P. napped.  On or about August 29, 2023, the Ponders were informed that their son, H.P. was having issues sleeping during nap time.  A meeting was immediately held the same day to address the matter.

19.    On Thursday, August 31, 2023, AMS informed the Ponders that H.P. would need to be picked up starting at noon each day.  The Ponders were told this was a transition period to allow H.P. to get used to AMS. The Ponders were given no alternatives.  The Ponders specifically chose AMS because it allowed for full day coverage for all their children.

20.    AMS did not offer to let the Ponders out of their contract.  The Ponders were strapped into a contract for full-time care but were receiving two to three hours of care.

21.     On Friday, September 8, 2023, Gonzalez emailed the Ponders to request a meeting regarding H.P.'s "dysregulation."  The Ponders were told that H.P. was not allowed to return to the school until after the meeting occurred on September 11, 2023, meaning the Ponders had to arrange childcare for H.P. so that they could attend the meeting.

22.    At the September 11, 2023, meeting, AMS stated that they "interpret behavior differently from the normative."   Ms. Gonzalez diagnosed H.P. with "undeveloped will" and provided her medical treatment plan. The medical treatment plan required that the Ponders follow a specific routine, recommending that they "modify the time each family member goes to bed and wakes up." The treatment plan instituted rules for speaking to H.P.  The treatment plan forbade the Ponders from walking to school and required that H.P. arrive by car at exactly 8 am daily.

23.    Ms. Gonzales informed the Ponders that H.P. would only be allowed to attend school until 10 am, until the next treatment meeting in two weeks.  During this two-week period, Gonzalez and AMS would treat H.P.'s condition and Gonzalez would determine if H.P. made medical progress in his treatment that would allow H.P. to attend until noon, not the contracted 3:15 pm.  They required that the school counselor Leslie Grove observe H.P.  Gonzalez stated that the treatment plan would "break the habit" of H.P. being in distress.   Gonzalez also demanded that the Ponders always keep their phones on to accommodate immediate pickups when AMS required it.

24.    On September 12, 2023, Leslie Grove notified the Ponders that she would observe H.P. on September 18, 2023, and that she wanted to schedule a conference to discuss H.P. with the Ponders.  This was scheduled for September 27, 2023.

25.    On September 15, 2023, the Ponders requested an update on H.P. and asked if he could gradually leave a little later.  Gonzalez informed the Ponders that this would not be an option.

26.    Another meeting was scheduled on Thursday, September 21, 2023 to discuss the progress of H.P.'s medical treatment.  However, on September 21, 2023, Jinny Gonzalez emailed the Ponders stating that AMS had to cancel the meeting due to being very busy.  They agreed to reschedule the meeting to September 26, 2023, and to move the pick-up time for H.P. the following week to allow him to stay until 10 am on Monday and Tuesday, 10:30 am on Wednesday and Thursday and 11 am on Friday.

27.    On October 2, 2023, Lesley Williams, H.P.'s teacher, informed the Ponders that H.P. had been improving and had "the best day at school so far."  There was no concern that he had behavioral issues that the school could not address. His time at the school was extended to noon each day.

28.    Gonzalez's treatment included hiring an occupational therapist to work with H.P. At the

recommendation of Jinny Gonzalez, the Ponders hired Jennie Buckley but later determined she was not an occupational therapist. Further, she recommended unnecessary therapy, such as vision therapy. This caused a delay in getting H.P. an OT evaluation.

29.     On December 20, 2023, Leslie Grove, the school psychologist, observed H.P. and found that he was doing very well. She noted that she would not be connecting with AMS administration until late January to discuss her findings. Regardless, and without waiting for their own psychologist's assessment, on January 5, 2024, Jinny Gonzalez instructed that H.P. no longer be allowed at the school past 11 a.m. Again, the contractual terms and payments were for full day coverage, not a two- or three-hour drop off. The school informed them that they had additional new children and due to accommodating them, they would need to pick up H.P. early each day until AMS was able to adapt to the new students.

30.     On January 23, 2024, AMS informed the Ponders that they were "changing things" and would not accommodate H.P. attending for more than a few hours each day at that time.

31.     On January 31, 2024, Ross Ponder's brother became ill and died March 5, 2024. AMS denied a request to allow H.P. to stay when Ross had to leave town before his brother's life support was pulled and was unable to pick him up at 11:45 am.

32.      H.P. had his initial OT evaluation on April 26, 2024. The school agreed to meet and discuss on May 17, 2024. At the May 17, 2024, meeting, the Ponders reported on the OT evaluation. The Ponders requested that H.P. be transitioned to extended day, as they had contracted for full-time school. The school refused to allow H.P. to go full-time in June and stated that they would need to wait for an evaluation in July when his teacher returned from vacation. It was evident that the school had staffing issues that needed to be addressed.

33.     On July 2, 2024, immediately upon her return from vacation, Ms. Williams, H.P.'s teacher,

communicated with the Ponders and stated that H.P.'s day should be extended to 12:30 pm.

34.    By July 30, 2024, it was becoming more evident that AMS had serious staffing issues.  Jinny Gonzalez sent multiple communications to all the families at AMS notifying them of staffing changes.  While the plan was for H.P. to begin transitioning to full day school, AMS continued to ask for him to be picked up early.  Additionally, AMS began requiring that R.P. to also be picked up early.  Further, according to AMS staff, at times there were as many as 39 children in the nap program called Casita.

35.    The teachers/Guides were clearly working without enough support and even disclosed their stresses and personal medical information regarding hormonal changes to the children through discussions highly abnormal and inappropriate to have with young students.

36.    While Montessori teachings allow students to be given guidance and redirection, they do not punish.  However, AMS allowed the stressed teachers to punish children and classes.  Access to water bottles were restricted to an entire class as a punishment and students were encouraged to go into the bathroom often without the lights on, as a normalized way of isolating children from the classroom for being "too loud."

37.    On September 11, 2024, the Ponders notified the school that the family's beloved dog was actively dying of cancer and would likely die in the next 1-3 days.

38.    On September 12, 2024, Jinny Gonzalez again provided notice to all the families of staffing concerns.

39.    On September 12, 2024, an AMS administrator called the Ponders at noon, stating that the youngest Ponder child, R.P., would need to be picked up early because she was not sleeping in Casita, something that had not previously been disclosed and was not a problem before or after R.P.'s time at AMS The Ponders were dealing with a different emergency in their home–the death

of their terminally ill German shepherd and desire to remove the animal's body prior to the children returning home.  AMS was unwilling to provide any concession regarding their demand to pick up regardless of what the family was managing at the home that day.

40.    On September 13, 2024, AMS again requested that both children be picked up early.  Again, there were significant staffing issues at AMS.

41.    On November 22, 2024, Jinny Gonzalez scheduled a meeting regarding H.P.'s progress under her medical treatment plan for December 5, 2024.  The Ponders informed AMS that H.P. would be going to the doctor to determine if he had ADHD, which directly conflicted with Ms. Gonzalez's treatment plan and diagnosis.

42.    On December 3, 2024, H.P. was formally diagnosed with ADHD.  The Ponders provided the diagnosis and medical documentation to AMS immediately.

43.    On December 5, 2024, at the scheduled meeting to discuss H.P.'s progress and accommodations, Jinny Gonzalez stated that she did not think that AMS was the right school for H.P.  Ms. Gonzalez stated that she did not believe in diagnosing or medicating a child for ADHD and did not approve of the treatment plan from H.P.'s actual physician.  In fact, with the support of AMS, Gonzalez specifically discussed her own medical plan, stating the need to override the diagnosis of an actual doctor.  AMS shortened H.P.'s days to half days.

44.    On December 7, 2024, H.P. was started on ADHD medication, which had very positive effects.  The Ponders requested that H.P. receive new evaluations by AMS to determine the effects of the new medication, which they had found effective at home.

45.    On December 16, 2024, the Ponders met with Baker and School Advisor, Jeff Schneider. Mr. Baker agreed to delay enrollment decisions for H.P. until the middle of the spring semester and to provide regular updates about how H.P. was performing in school, including the response

to medication.

46.    However, from December 16, 2024, to January 27, 2025, AMS refused to provide feedback. The Ponders made repeated requests to meet to discuss H.P. and requested that Gonzalez be taken off the team, due to her alternative medical diagnosis and treatment and disregard of H.P.'s licensed pediatrician and faculty member at Dell Medical School.

47.    On January 17, 2025, Baker sent correspondence stating that AMS would not be offering an enrollment contract for the following year to H.P. Mr. Baker also chastised the Ponders for requesting that Gonzalez be removed from H.P.'s case, stating AMS's support for Gonzalez and her quack medicine, dismissing the parent and pediatrician input and advice.

48.    On January 24, 2025, the Ponders met with Mr. Baker and Mr. Schneider. The Ponders highlighted communication issues, the lack of communications with parents and the systematic barriers that prevented parents from being informed of concerns regarding their children, noting many parents shared these concerns. Mr. Baker informed them in this meeting that not only was H.P. not allowed to return next semester, that AMS was expelling H.P. on February 7, 2025.

49.    On January 24, 2025, the Ponders filed a complaint with the Texas Health and Human Services based on their experiences and after reviewing AMS's most recent HHS inspection in October 2024, which recorded deficiencies in recordkeeping, naptime, and operational policies regarding suspension and expulsion. The Ponders also requested to receive copies of these relevant records and policies but were denied by AMS. The fact that this complaint was filed was made known to AMS on January 25, 2025.

50.    On January 28, 2025, Baker emailed to inform the Ponders that all the Ponder children would be expelled if the Ponders did not follow the demands of AMS, including following the medical treatment plan created by Gonzalez.

51.    The same day, the Ponders informed the other school parents of the ongoing issues in a WhatsApp post, in an effort to make changes intended to help all students gain community support and raise concerns.  The WhatsApp group was a private, optional, parent-run platform that was not associated with the school administration and with a minor fraction of the school's parents actively participating.  The school had no right to limit speech in this forum or have an opinion about a forum not inclusive of the school or faculty.  This would be akin to the school trying to limit conversations between parents in a home, church or any other off property location.

52.    On January 29, 2025, the Ponders received H.P.'s initial evaluation from Austin ISD.  AISD determined that H.P. would be placed in a standard classroom with minor accommodations and did not need a special education classroom, occupational, speech, or vision therapy. The results were immediately distributed to AMS and the Ponders requested a meeting.

53.    On January 30, 2025, Baker sent a letter to all parents, guardians, and staff at AMS stating that the information provided by the Ponders was "misleading" and that "false claims" were made. The statements made were derogatory and caused the Ponders financial harm.  The decision to expel all three children was made on or before the same day.

54.    A coffee was held at 8:30 AM on January 31, 2025, at the Ponders' home to further discuss systematic communication issues affecting many students at AMS. At 5:45 PM on January 31, 2025, AMS terminated the enrollment of all three children.  It was stated by AMS that the terminations occurred because the Ponder parents' "actions were detrimental to the school."  Clearly the actions referred to are the filing of the HHS complaint and reaching out to other parents to discuss the communication concerns.  The termination of the Ponder children was retaliation.

55.    The impact on the family has been extreme.  While attending the school, the quack

medicine diagnosis and treatment plan instituted by Gonzalez caused H.P. harm.

56.    H.P. has suffered extreme anxiety, mental anguish and distress at the hands of AMS.  The level of torture he experienced was not understood until he was placed in a new school, where he is thriving.  The Montessori teaching is to provide peaceful development, particularly from ages three to six, something that AMS did not provide the Ponder children.

57.    The malicious punishments and unreasonable demands made of H.P. and the Ponders caused chaos, anxiety, and disruption of the entire family.  The Ponders' entire lives were dismantled, as the school would call with less than 15 minutes notice and demand that a child be picked up. They were no longer allowed to follow their chosen morning routine.

58.    Further, the Ponders were forced to spend thousands of dollars on treatments that Gonzalez prescribed to treat her diagnosis of  H.P. with "underdeveloped will." These treatments were not necessary or beneficial to treat H.P.

59.    Due to the change in hours, the Ponders ability to work full-time was severely impacted, clearly impacting their earning abilities.

60.    Sarah Ponder's career was damaged by the actions of Defendants. Some of her clients received the letter, causing at least one to terminate the relationship.

61.    The expulsion and the entire AMS experience caused extreme mental anguish for the entire family.  The Ponder children have faced severe emotional distress in having to change schools. They were not able to be immediately placed in school, causing educational disruption.

## V. CAUSES OF ACTION

### A. Count 1- Negligence

62.    Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

63.    The occurrences made the basis of this suit, and the resulting injuries and damages of the

Plaintiffs were proximately caused by the negligent conduct of the Defendants. Defendants were negligent by breaching the duty that was owed to the Plaintiffs, to exercise ordinary care in one or more of the following acts or omissions, constituting negligence:

      a. Failing to exercise the care necessary under the circumstances;

      b. Failing to do what a reasonable daycare would have done under the circumstances;

      c. Failing to intervene to ensure a child's safety;

      d. Failing to provide proper supervision;

      e. Failing to properly hire, qualify, train and supervise its employees;

      f. Failing to provide reasonable accommodations; and

      g. Failing to adhere to the Texas Minimum standards for childcare.

64.     Defendants had a duty to exercise ordinary care in caring for and supervising the children in its care so as to prevent injury to Plaintiffs H.P., R.P. and L. P.

65.     Defendants had a duty to maintain a safe environment for children in its care.

66.     Defendants had a duty to hire, train, and supervise caregiver employees to ensure children were not subjected to inappropriate medical treatments or action plans and to prevent injury to Plaintiffs and other children similarly situated.

67.     Defendants breached the duty of care by failing to care for the children, failing to supervise the children, failing to use positive methods of discipline, failing to stop discrimination, failing to provide accommodations, and failing to properly train, hire, and supervise its employees.

68.     Defendants' negligent acts and/or omissions, and breach of duties, directly and proximately caused injury to Plaintiffs, which resulted in significant damages.

**B. Count 2- Negligence Per Se**

69.     Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

12

70.    Defendants failed to exercise the mandatory standard of care in violation of the minimum standards for childcare.

71.    Texas law requires that discipline be positive and encourage self-esteem, self-control, and self-direction. 26 TAC 744.501. Refusal to provide water and putting children in dark bathrooms is not appropriate punishment.

72.    AMS failed to encourage the Ponder children to express feelings and failed to give appropriate attention.  26TAC 746.2601 When H.P. was upset or speaking loudly he was sent to a bathroom, sometimes without lights on.

73.    AMS failed to comply with the regulations regarding nap times and food service for H.P.  26 TAC Sec. 746.2901-2911; 26 TAC Sec. 746.3301-3321. H.P. and R.P. were forced to nap for more than an hour.   H.P. was not allowed to have unhurried meals.

74.  Under Tex. Occ. Code §§ 151.002(13), 165.152, any person who diagnoses or treats a physical or mental condition without a license commits a statutory violation. By diagnosing H.P. to have an "underdeveloped will," prescribing a treatment plan, monitoring the child's response, and usurping a licensed physician's authority, Gonzalez engaged in the unlicensed practice of medicine. Plaintiffs are in the class the statute protects (patients and parents), and the statutory breach proximately caused their injuries.

75.    AMS and Baker aided and abetted this unlawful medical practice by providing institutional support, refusing to curtail Gonzalez's medical interventions, and explicitly defending her unauthorized medical decision-making authority over licensed medical professionals.  Plaintiffs were, at all times, members of the class that the statutes the Defendants violated were designed to protect.

76.    Defendants' violation of the statutes were the proximate cause of Plaintiffs' injuries.

13

77.     As a result of the Defendants' illegal acts and/or omissions in violating the statues Plaintiffs sustained injuries.

**C. Count 3- Gross Negligence**

78.     Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

79.     Defendants' conduct was more than momentarily thoughtlessness or inadvertence.  Rather, the acts and/or omissions by Defendants constitute gross negligence as defined in the Texas Civil Practice and Remedies Code.

80.     Defendants' conduct involved an extreme degree of risk, considering the probability and magnitude of potential harm to the Plaintiffs.  Defendants had actual, subjective awareness of the risk involved, but, nevertheless, proceeded in conscious indifference to the rights, safety, and/or welfare of the Plaintiffs and/or other similarly situated individuals.  Plaintiffs suffered damages and further seek punitive damages.

**D.  Count 4- Negligent Activity**

82.     Plaintiffs incorporate the above paragraphs by reference as if stated fully herein.

83.     Defendant AMS is the owner, operator and possessor of the daycare premises.

84.     Plaintiffs H.P., R.P., and L.P. were minor children placed in the care of Defendants and thus an "invitee" to whom Defendants owed a duty to exercise reasonable care.

85.     Defendants owed a legal duty to ensure the Plaintiffs' safety, ensuring employees are necessarily hired, trained, supervised, and terminated in order to maintain a safe environment for children.

86.     Such negligent activity on the part of Defendants proximately caused the injuries and other damages suffered by Plaintiffs.

**E. Count 5- *Respondeat Superior***

87.    Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

88.    The negligence, carelessness, and callousness of Defendant AMS's employees proximately caused the damage and loss suffered by Plaintiffs.    At all times material to this action, Defendant AMS's employees were acting in the course and scope of their employment.    Accordingly, Defendants may be held responsible for its employees' negligence under the doctrine of *respondeat superior*.

**F. Count 8-Breach of Contract**

89.    Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

90.    Plaintiffs had entered a valid contract for the provision of childcare services for their three minor children.    There was a meeting of the mind, evidenced by the signing of the contracts, applications, and general paperwork generated by Defendant AMS.

91.    Plaintiffs tendered performance according to the terms of the contract.

92.    Defendant AMS breached its duties and obligations under the contract, both explicit and implicit, pertaining to providing appropriate care, custody, and supervision by all acts stated above.

93.    Defendant AMS's breach was the proximate cause of damages to Plaintiffs, both direct and incidental/consequential.

94.    Further, Plaintiffs seek to recover their attorney fees under the Texas Civil Practices and Remedies Code.

**G. Count 9- Fraud**

95.    Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

96.    Plaintiffs discovered that Defendants had been defrauding them by making promises and commitments to get Plaintiffs' money, knowing the statements were false and that they had no intention of fulfilling.

97.     Defendants made material misrepresentations that were false.  Defendants knew these statements were false or they were made recklessly without any knowledge of the truth and as a positive assertion.

98.     Defendants made the statements with the intention that Plaintiffs would act upon it and Plaintiffs acted in reliance of the representations and causing injury, damages, and harm.

99.     Plaintiffs seek treble damages and attorney fees.

**H. Count 10- Fraudulent Inducement to Contract and Breach of Contract**

100.    Plaintiffs incorporate by reference the above paragraphs by reference as if stated fully herein.

101.    The Ponders enrolled all their children at AMS because AMS stated that they followed the Montessori teaching paradigm and that they would offer full-day schooling for the three children, from 8 am to 3 pm. The Ponders relied on these assertions when entering into contracts with AMS.  The Ponders were further induced to re-enroll for a second year.

102.    AMS further promised to guide students to their fullest potential using the Montessori principles of independence, self-discipline, and social belonging.  These principles were not utilized.

103.    The AMS parent handbook, adopted into the contract, outlines procedures for programmatic changes and communication that were not followed by AMS.  The AMS parent handbook states that AMS will work in partnership with the parents.  AMS refused to provide information, observations, or inform them of incidents at the school.

104.    AMS fraudulently induced the Ponder family to contract for all three children's education.  AMS breached its contracts with the Ponders by failing to allow the children to receive full day education, failing to follow the school policies, and failing to follow Montessori

16

teachings.

105.    As a result of Defendants' fraudulent inducement, Plaintiffs suffered harm, injury and damages.  Further, Plaintiffs seek attorney fees and treble damages.

## I.  Count 11- Civil Conspiracy

106.    Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

107.    Defendants acted in combination to seek or accomplish a course of action to commit unlawful acts. There was a meeting of the minds of the Defendants to agree to accomplish the above stated unlawful acts.  Defendants were aware of the intended harm or wrongful conduct at the outset of the combination or agreement.  As a result, Plaintiffs suffered harm, injury and damages.

## J.  Count 12- Retaliation

108.    Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

109.    AMS allowed Defendant Gonzalez to make these unfounded commands and fully protected her quack medicine.  Defendants expelled H.P. in retaliation for Plaintiffs' questioning of Gonzales's medical treatment plan and for seeking a true medical diagnosis that was inconsistent with her plan.

110.    Defendants retaliated against the Ponders for the filing of a complaint with the HHS and for discussing concerns in the WhatsApp Parent Group by expelling the Ponder children.  As a further act of retaliation, AMS chose to send an email to the entire school email list, including parents, caregivers, faculty and staff, making defamatory statements against the Ponders to all families at AMS.

## VI. DAMAGES

111.    Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

112.    Defendants' acts and omissions jointly and singularly, were the proximate cause of injuries to Plaintiffs, including but not limited to:

1.  Loss of value of the tuition/fees that Plaintiffs paid for the childcare;

2.  Loss of wages for Mr. and/or Ms. Ponder incurred by having to stay home and care for their children when sent home early and later when expelled;

3.  Medical expenses for the reasonable and necessary examination of H.P.;

4.  Medical expenses for the reasonable and necessary therapy for Plaintiffs;

5.   The cost of the inappropriate medical treatment prescribed by Gonzales;

6.  Physical pain and suffering in the past;

7.  Mental anguish in the past;

8.  Mental anguish, in reasonable probability, sustained in the future;

9.  Lost wages in the past;

10. Lost wages, in reasonable probability, sustained in the future;

11. Loss of wage-earning capacity in the past;

12. Loss of wages/earning capacity, in reasonable probability, sustained in the future;

13. Loss of normal enjoyment of the pleasure of life in the past;

14. Loss of normal enjoyment of the pleasure of life, in reasonable probability, sustained in the future;

15. Treble damages;

16. Punitive damages;

17. Pre-judgment and post-judgment interest;

18. Court costs;

19. Reasonable and necessary attorney fees; and

20. Costs of suit.

## VII. CONDITIONS PRECEDENT

113.    All conditions precedent have been performed or occurred, except for mediation which is addressed below.

## VIII. JURY DEMAND

114.    Plaintiffs respectfully demand the right to have a trial by jury and have tendered the jury fee in Travis County District Court.

## IX. PRAYER

WHEREFORE, Plaintiffs pray that Defendants be cited to appear and answer, and that on final trial Plaintiffs have and recover:

1. Judgment against Defendants for a sum in excess of the minimum jurisdictional limits of this Court;

2. Pre-judgment at the highest legal rate;

3. Reasonable and necessary attorney's fees;

4. Taxable Court costs;

5. Post-judgment interest on the above amount at the highest legal rate; and

6. Such other and further relief to which Plaintiffs may show themselves justly entitled in law or equity.

Respectfully submitted,

**WELBORN LAW LLC**
8712 Mesa Suite B206
Austin, Teas 78759
Telephone:  (512) 825-3390

By: */s/ Amy C. Welborn*
    Amy C. Welborn
    State Bar No.  24012853
    amy@welborn-law.com

**ATTORNEY FOR PLAINTIFFS**


## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record are being served with a copy of the foregoing document via the Court's CM/ECF system on 11th day of June 2025.

*/s/ Amy C. Welborn*
Amy C. Welborn

REDACTED PUBLIC VERSION

# EXHIBIT 1

H█ Ponder
Entering  2024 - 2025
Grade    CH Mid Cycle - Early Childhood



**Austin Montessori School**

## AMS Year-Round All School Enrollment Agreement 24-

**Introduction**

H█ Ponder

Entering Year: **2024 - 2025** Date of birth: █████

This contract ("Contract") is between Austin Montessori School ( "School") and the parent or legal guardian ("Parent," singular or plural, as applicable) of the above-mentioned student ("Student"). Parent must complete and sign this Enrollment Contract and Tuition Schedule by clicking "submit" to the School for processing. Once submitted, a copy is available for your records in the Files & Forms section of your profile.

**Parent Partnership Agreement**

By signing this contract, Parent agrees to the policies and guidelines outlined in the AMS Parent Community Handbook and Partnership Agreement. **This is a legally binding contract. Read it carefully.**

**Tuition and Fees**

Annual tuition is listed under the "Expenses" section below. Parent agrees to pay the tuition  specified below according to the terms of this Contract.  Parent acknowledges that the tuition changes as the Student's participation in the School program change (i.e., advance in level).  If any change occurs after the school year starts, Parent agrees to pay the School the increased amounts as specified in the published tuition and fee schedule:
AMS Tuition and Fee Schedule 2024 - 2025.

**New Family Fee**

A family new to Austin Montessori School will be charged a one-time fee of $500.  This fee will be added to the Smart Tuition account and is in addition to the tuition and fees listed on the Enrollment Contract.

**Expenses**

| | |
|---|---:|
| Children's House - Year Round | $20,265.00 |
| **Total Expenses:** | **$20,265.00** |
| | |
| **Total Due:** | **$20,265.00** |

**Due at Enrollment**

| | |
|---|---:|
| Deposit | $300.00 |
| **Total Due at Enrollment:** | **$300.00** |

Please review the descriptions below for the available payment plans, and then choose your desired option in the section below.



**H■■■ Ponder**
Entering 2024 - 2025
Grade  CH Mid Cycle - Early Childhood



### AMS Year-Round All School Enrollment Agreement 24-

•●<u>One Payment Option</u>: payment of tuition for the Student's program to be paid in one payment on or before June 3, 2024.

•●<u>Monthly Payment Plan Option for Regular Year Programs</u>: payment of tuition for the Student's program to be paid in 12 equal payments, with the first payment due on August 3, 2024, and on the 3rd day of each month thereafter through July 3, 2025. The monthly payment plan option will incur a fee of $27.08/month ($325 total/year)



12 Month Plan
12 Payments                    ✓

### Terms of Enrollment

**Austin Montessori School Terms of Enrollment**

Parent understands that all persons responsible for paying any of the amounts due under this Contract must execute the Contract and that all such persons are jointly and severally liable for the amounts due as set forth herein. Parent's signature and/or initials on this Contract evidence Parent's understanding and agreement to the terms of this Contract, as follows:

1.•**Enrollment**: Student will be enrolled for the 2024-2025 academic year. Parent is aware that a final determination of grade and classroom placement will be made by the School in accordance with the School's admissions policies and these decisions are made at the School's discretion. This Contract is valid only for the academic year stated and does not entitle Student to any future enrollment.

2.•**Tuition Obligation**: Parent understands that Student is being enrolled for the academic year covered by this Contract (or remaining portion thereof, in the case of a mid-year enrollment or mid-year move to another level). Parent acknowledges that the tuition and fees change as the Student's participation in the School program change (i.e., advance in level). If any change occurs after the school year starts, Parent agrees to pay the School the increased amounts as specified in the School's published tuition and fee schedule. Parent is responsible for the full tuition amount through the end of the academic year even if Student is withdrawn from or ceases to attend the School. Parent further understands that the overhead expenses of the School do not diminish with the departure of a student during the course of the school year and agrees that it is impossible for the School to determine at the time of the execution of this Contract the damage and loss to the School that would occur due to the later cancellation/withdrawal of students who have enrolled. Therefore, once this Contract has been submitted to the School, Parent becomes liable for the tuition, according to the following schedule:

•●Through May 1, 2024 – responsible for 25% of annual tuition payment
•●After May 1, 2024 – responsible for 100% of annual tuition payment

3.•**Termination Procedures**: Parent may terminate this Contract by submitting a WRITTEN termination notice ("Termination Notice") to the Head of School by May 1, 2024 ("Partial Release Date"). The Termination Notice must (a) be dated, (b) state the Student's name, (c) provide a reason for the termination of the Contract; and (d) be RECEIVED by the Head of School on or before the Partial Release. If such Termination Notice is received before the Partial Release Date, Parent will be partially relieved of tuition obligation as provided in Paragraph 2, above.

4.•**School/Family Partnership**: A positive and constructive working relationship between the School and Parent is essential to the fulfillment of the School's educational purpose. Thus, the School reserves the right not to extend the privilege of enrollment or re-enrollment to Student if the School reasonably concludes that the actions of Parent make such a positive and constructive relationship impossible or otherwise seriously interfere

H▇ Ponder
Entering  2024 - 2025
Grade    CH Mid Cycle - Early Childhood

**Austin Montessori School**



**AMS Year-Round All School Enrollment Agreement 24-**

with the School's accomplishment of its educational purpose. Moreover, the School reserves the right to dismiss Student at any time if, in the judgment of the Head of the School, conduct of anyone directly associated with Student, including but not limited to Student's Parent, in or out of the School, is not in keeping with the School's accepted standards or principles. There will be no refund of tuition in the case of such dismissal and any unpaid balance is payable in full according to the terms of this Contract. If for any reason, the School administration determines that it is in the best interest of the School, The School also reserves the right to withdraw an offer of enrollment or re-enrollment at any time, and/or to nullify an executed Enrollment Contract, if the School administration determines, in its sole discretion, that doing so is in the best interest of the School.

5.•**Tuition Assistance**: Parent understands that if the Student has applied for or received a tuition assistance award toward the amount of tuition hereunder; the Parent remains primarily responsible for all obligations under this Contract. Upon Parent's acceptance of this contract and the tuition assistance award, Parent agrees to pay the balance due pursuant to the payment plan established by the School.

6.•**Probationary Enrollment for New Students:** All new enrollments are probationary for an eight-week period. If the school is concerned that this enrollment is not in the best interest of the child or the classroom, a conference will be held before the end of the eight-week period with the Head of School, Level Director, Director of Enrollment Management, and parents. Possible outcomes include an agreement to terms of continued, conditional enrollment, or withdrawal of enrollment. The decision to continue or withdraw enrollment is at the sole discretion of the school and is final. The school reserves the right to refund any portion of the tuition based upon the student's withdrawal from the school. Any refund shall be at the sole discretion of the school. In accordance with Austin Montessori School's admissions policy, enrollment beyond the eight-week period lies solely at the discretion of Austin Montessori School.

7.•**Termination of Student's Attendance**: The School has the right to suspend or terminate any Student if (i) in the sole discretion of the School administration, it is determined that the continued attendance of the Student is detrimental to the School community, the Student or to the other students of the School, or (ii) the Parent has failed to pay all or any part of the tuition or fees required under this Contract.

8.•**School Rules**: Student's enrollment at the School is subject to the general statements, rules regulations, conditions, traditions, and financial terms contained in the School's Community Handbook and other published documents, which may be amended from time to time. Parent acknowledges that Parent and Student must abide by such School rules and guidelines.

9.•**Transcripts/Records**: All accounts must be paid in full before records and transcripts can be released or transferred to other schools. Student will not be allowed to continue to attend classes or other programs or activities unless tuition and fees are paid by stated deadlines (or until Parent makes other written arrangements acceptable to the School). The School shall have the right to seek legal action as it may deem appropriate to collect all amounts which are not paid when due. In the event that the School takes legal action to enforce the terms of the Contract, Parent shall be responsible for all costs, including reasonable attorney's fees and costs (whether incurred before, during or after the filing of the lawsuit).

10.•**Delinquent Payments**: Parent understands and agrees that a late charge of $35 will be added for any payment not received within 10 days after the due date ("Late Payment"). Parent understands that at no time does the School intend to contract for, charge, or receive interest in excess of the maximum amount permitted by law and, if it is determined that the School has done so, the School shall credit the excess to any remaining tuition or fees due under the Contract or refund the excess to Parent. In the event that a Parent is more than 90 days in arrears with any tuition or fees due under the Contract, the School reserves the right to accelerate the remaining tuition and fees due under this Contract.

11.•**Release of Student Records**: Parent consents and holds the School harmless for the release of Student's records and information upon request by an education institution or law enforcement agency. Parent also releases and holds the School harmless from any liability stemming from such use, disclosure, or release of Student's records or information.

12.•**Governing Law/Disputes/Waiver of Jury Trial**: This Contract shall be governed under the laws of the State of Texas. In the event of a dispute regarding the terms of this Agreement or Student's enrollment at the School, the parties agree to first try to resolve such dispute informally through non-binding mediation. The costs of mediation shall be equally borne between the parties. In the event of litigation, the venue of any action hereunder shall lie exclusively within the Circuit Court of Travis County, Texas, and the parties hereto consent to personal jurisdiction and expressly waive all right to trial by jury.

H███Ponder
Entering  2024 - 2025
Grade     CH Mid Cycle - Early Childhood



**Austin Montessori School**

### AMS Year-Round All School Enrollment Agreement 24–

13.▪**Understanding of Terms**: Please read this Contract carefully. By signing below, Parent acknowledges that Parent understands the terms of this Contract, Parent's obligation to pay the full year's tuition even if the Student is withdrawn or dismissed, the Parent's option to terminate, and all other obligations set forth herein. If Parent has questions about the terms, Parent is encouraged to seek the advice of counsel or to seek clarification from the Director of Admission.

14.▪**Force Majeure**: The School's duties and obligation under this Contract shall be suspended immediately without notice during all periods that the School is closed because of force majeure events including, but not limited to, any fire, act of God, hurricane, war, governmental action, an act of terrorism, epidemic, pandemic, strike, civil unrest, or any other event beyond the School's control. If such an event occurs, the School's duties and obligations in this Contract will be postponed until such time as the School, in the sole discretion of the School administration, may safely reopen. In the event that the School cannot reopen due to an event under this clause, the School is under no obligation to refund any portion of the tuition paid.

*Austin Montessori School does not discriminate on the basis of race, ethnicity, national origin, ancestry, gender, gender identity or expression, sexual orientation, age, or disability in the administration of its hiring, admissions policies, tuition assistance program, or other school-administered programs.*

To ensure a place for the Student, this Contract must be executed and submitted to the School, along with the $300 registration fee.

Ross Ponder

| | |
|---|---|
| Signature | Date |

Sarah Ponder

| | |
|---|---|
| Sarah Ponder | 1/17/2024 |
| Signature | Date |

Accepted by Austin Montessori School, Inc. a Texas non-profit corporation

## Grae Baker

**Name:** Grae Baker
**Title:** Head of School

**School Signature**

Grae Baker